The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. You may be seated. In our next case, United States v. Bland, Mr. Mancini, good to have you with us, sir. Thank you. Good morning and may it please the Court. Sam Mancini on behalf of the appellate Marcus Bland. The police violated Mr. Bland's Fourth Amendment rights by seizing him without reasonable suspicion that he was unlawfully carrying a concealed weapon. I'd like to start with the seizure and when it occurred and then move to reasonable suspicion. The officer seized Mr. Bland when they approached him in the middle of the night while he was sitting in a car parked in front of a 7-Eleven convenience store. I appreciate that's your position. If the district court's determination of when there's a seizure, just hypothetically, if we agreed with that, do you question that there was reasonable suspicion at the time he grabbed Mr. Bland's arm? No, we don't. Everything depends on when there was a seizure from your perspective. Exactly right. We argue that the seizure occurred before he grabbed the arm. You don't have an alternative argument that even when he grabbed his arm there was a problem. So this is all about when seizure occurred from your perspective, right? Yes, Your Honor. Thank you. And the seizure occurred before he grabbed the arm. I'm sorry, can I just ask you, and there was reasonable suspicion when the officer grabbed the arm of what exactly? At that point, I think the officer had reasonable suspicion that Mr. Bland maybe was attempting to assault at that point by reaching for the weapon. At that point, I still don't think there was evidence that the officer was, or I'm sorry, that there was evidence that Mr. Bland did not have a permit and was violating the concealed carry permit. But by reaching for the firearm at that point, the officer was within his rights to execute a Terry stop because of the fear maybe of an assault or something. But before that point, the seizure had actually occurred before that point because the officers had made a show of authority by stopping, or by approaching Mr. Bland, the officer who questioned him. Officer, good night. Approaching the vehicle? Yeah, approaching the vehicle. He walked up to the passenger door where Mr. Bland was, shined a flashlight in his face, ordered him or instructed him to roll down the window, and then asked him if he had a gun. And at that point, Mr. Bland was not, no reasonable person in Mr. Bland's position would have felt free to leave or ignore the officer's show of authority. So the seizure just, because these are sort of like second-by-second cases, but the seizure occurs when he asks the question or when he tells him to roll down the window? I think it's when he asks the question at that point because when he tells him to roll down the window, then Mr. Bland complies with that, submitting to the show of authority. When was the question asked? The question was asked immediately after he rolled down the window. After he rolled down the window? Yes, after. Did he ask the question if you still have the gun immediately, or did he, I can't remember this exactly, but it seemed like he started to and said you're leaning on it. And so he really never asked the question until Bland leaned over. And it's almost like there's no, you never get to the question because of the conduct. I mean, this is all within seconds. Maybe I'm misremembering that. Certainly you know the record better than me. But it seemed like he didn't finally say we have an undercover officer who's reported a gun. Do you still have it until after he had leaned it over and may have been trying to cover up or hide the fact that he had a gun? Yes, so it does happen in a matter of seconds. Once he rolls down the window, the officer says we just had an undercover officer in here. You're actually leaning on it. Do you still have your gun? And that's all sort of one sentence. The leaning over, though, the district court explicitly found that, or she did not credit that testimony that he was making any sort of blading or covering motion. He was just leaning closer to listen to the officer, or that was an equally possible, equally plausible that's what he was doing was he was just leaning over. So everything's okay, no seizure, until he says do you still have the gun? Yes, yeah, at that point, because I think the question do you still have the gun, not only is that sort of an accusatory investigatory question, but it shows that they're really targeting Mr. Bland. I mean they pull into the parking lot and immediately walk right up to him. Can I ask you about that? Because it does, I totally, I know the law that says if you ask these accusatory questions, usually we have said usually the police start with some pleasantries, and then they say can I ask you a question. So the first thing out of their mouth isn't an accusation. But it does seem to me that, and I understand you can read this as being kind of accusatory, but it's also kind of a safety question, right? If you're going to stop someone in a parking lot in the middle of the night, and we've said that's fine, that's still a consensual encounter, it does seem like maybe actually the first thing you'd want to know, if you know that the person was armed recently, is first question, are there any guns here? That's true, but I think in this situation by talking about the undercover officer, it's clear that they're looking into Mr. Bland. This isn't just some sort of routine encounter. Hey, do you have a gun on you? What's going on around here? An undercover officer saw you with a gun. Do you still have it? And so I think they're making it clear we're investigating you particularly. Certainly that we want to talk to you in particular. I agree with that. Yeah. But I'm not sure I'm seeing the accusation. The particularized part, yes. But, I mean, in your own position, your position is having a concealed weapon. That's not an accusation. If you have a permit, it's fine. That's true. I think it's somewhat similar to the situation in Jones, where that's the one where they sort of blocked the car into the alley, and they went up to the driver, and they asked him to lift up his shirt so that they could search. And in that case, they also sort of said, hey, how's it going? Can you lift up your shirt? So just because the statement is formed as a question where there might be some pleasantries doesn't mean there isn't a seizure here. And I think the question or the targeting of Mr. Bland is just one factor to look at. You also have the flashlight, the time of day, which was in the middle of the night, and the fact that the officers were in uniform, were armed, where they parked their vehicles. I understand that the district court found that the car wasn't blocked in, but I still think them driving into the parking lot sort of flanking his vehicle and then immediately proceeding to him. Is there any evidence that Mr. Bland knew the locations of the vehicles? I think there's no direct evidence in the record. The officer, Officer Goodnight, who's the one who goes up and questions him, says that he made eye contact with him in the side view mirror or the rear view mirror, and Officer Goodnight was parked directly behind the car that Mr. Bland was in. So it's reasonable to think that he could have seen the cars behind him, but there wasn't a finding one way or the other. I'm sorry to cut you off after asking the question, but does that, I mean, do you agree if there's things that might cause someone to not be free to leave that they don't know about, those don't count? I would agree with that because I think it's from the perspective of a reasonable person in the defendant's shoes. But how do we, I mean, just looking at the video and there's no sirens, I just, I mean, I don't get in, really wasn't discussed a lot by the district court, but just looking at it myself, I mean, there's just no indication that it's at least obvious that he would see the location of the cars. That might be true, but I guess even if he didn't know the location of the cars, I think once he sees the officer come up, and I think the real key fact here is where Officer Goodnight positioned himself when he was talking to him, by standing right next to the door and blocking Mr. Bland's ability to exit. But aren't you there, I mean, that's interesting, and I hear you. I mean, you know, it's true, you couldn't, you'd either have to hop over the console, which, you know, that's probably not the best idea if a policeman's talking to you, even if in theory you have some legal right to do it. Or you have to get out, you have to, you know, arguably he's got to move out of the way or something like that. But he, you know, I mean, I think our law says you don't, if you're still in a non-seizure situation, presumably you can say I'm not going to talk to you. And does your position kind of mean that if someone happens to be in a car, in the passenger seat, if coming up there means he's seized, haven't you eliminated this ability to have a voluntary conversation? No, I don't think every time the police go up to talk to someone in a car, a parked car, that they're initiating a seizure. Here, the distinguishing factor, I think, is that there was no driver in the car. So there was no way to drive away. A lot of the cases – So the fact there's no driver in there is on your side, then? Yes, I would say that. Because if there were a driver or if Mr. Bland were in the driver's seat, he could simply drive away. I mean, that's Lewis and – There was nobody under the wheel there. There was no one under the wheel. The driver was inside the 7-Eleven, I think, buying lottery tickets. I mean, driving away is kind of – even though physically there's room for him to drive away, and legally he could drive away, it's kind of nuts to say you're going to drive away and everything's going to be okay. But if your position is that's okay, why couldn't he just roll up the window and say, I want to talk to you, officer? Because I think, at that point, the officer – I think you have to think of it from Mr. Bland's perspective. It's the middle of the night. There's an officer literally inches away from your face with a flashlight asking if you have a gun, and he directed you to roll down the window and he complied with that. But you're saying that on the passenger side, he could drive away and we wouldn't have – he'd be free to leave. It's odd to me that you think that would make him not seized, but in the passenger side, he is. I don't mean to just keep beating a dead horse, but that seems odd to me, that you think he could drive away in a parking lot with a police officer approaching him and shining a flashlight at him, if that's your intent, but not refuse to talk and not roll up his window. I think that's the key difference, though, is that you have the ability to get away. There's a way to leave. Counsel, isn't that just the – I'm forgetting the name, but the case with the bus, is it Bostick, where you're on a bus. You don't want to get off the bus. You've got somewhere to go. You don't want to be standing on the side of the road. And the Supreme Court said even so, you haven't been seized because it's not the police officer's fault that you can't just get off the bus. And we ask a different question, which is not would you be able to leave, but just would you be able to terminate the conversation, to stop talking to the police officer. So I guess I'm not seeing why it matters that there's not a driver who could drive the car away. That's just Bostick. There's no realistic possibility you can get off the bus because you don't want to leave. I think there's actually two factors about Bostick that make it different. First, it was in a busy public place with a lot of people around. I think there's somewhat strength in numbers. You might feel more comfortable refusing to talk to the police if other people aren't doing it. It also seems like a routine inspection where they're asking multiple people, not just you and targeting you. The other fact about Bostick is the officers informed the passengers that they could say no, that they did not have to consent to a search of their bags. And we don't have that here. I think if the officer had said, you don't have to talk to me or something like that, that's not required. But if you had that factor, that might change the calculus here. And I think in Drayton, which is the other bus case, the court decided later, one of the factors they looked at was that the officer started in the back of the bus and left the aisle open and came forward, leaving the ability for the passengers to exit. And here, that's the problem. There's nowhere for Mr. Bland to go. He can't exit the vehicle. He can't drive away. There's really no escape route. And when you have an officer inches from your face asking about a gun with a flashlight, I don't think it would be reasonable to just roll up the window and ignore him at that point. What about the issue that there's in the system? I think Weaver's testament is a credible source, a credible source of information, and that there's evidence that Mr. Bland had a gun that was exposed, went out, came back, and it was no longer exposed but was concealed. Or maybe just it was concealed but visible in his clothes. Do the police officers not have the ability to ask him if he has a permit? They could ask him if he has a permit if it was a consensual encounter, I think. They can't initiate a Terry stop based just on the fact that he has a concealed weapon. That's Virginia law? You're talking about a concealed permit is an affirmative defense or something under the Virginia statute? It is an affirmative defense, but I don't think that makes a difference for the Fourth Amendment purposes. That doesn't have anything to do with it? No, I think the officers still need some evidence of illegality. They have to know that you're doing something unlawful, and I think that's why the driving cases are so helpful. You can't just stop someone on the highway to spot check if they have a license or not. As it turned out, he had a felony conviction. It turns out he had a felony conviction, but here the officers had never had any action. Did you represent him at the earlier proceedings? I did not represent him in the trial court. Someone else in my office did. You're the public defender's office? Yeah, the public defender's office. You all had, instead of a conditional plea, you had a stipulated bench trial. Yes. Is that something you do a lot? I think we do it sometimes. I've never heard of that before. I don't think I remember it anyway. I've seen a lot of conditional pleas, but here you had a bench trial and stipulated the facts. Yes, I think to preserve the suppression and the Second Amendment issue. To preserve the issue. Exactly, because we're not allowed. Again, I wasn't representing Mr. Bland below. I can't speak to the discussion. But you're the only lawyer we got here, so you have to answer the question. Yeah, no, exactly. I don't know exactly why a conditional plea couldn't be reached, but sometimes when that doesn't happen, they end up doing a stipulated bench trial to preserve the pretrial issues for appeal. Just to follow up on the concealed weapon issue. As I understand your position, it's okay, an officer is permitted to ask an individual who they suspect may have a concealed weapon if they have a permit, but they must do so in a voluntary way, not in something that's a seizure? Yeah, I could imagine a pedestrian encounter where you're out in the open, you're in public, and you're talking, and it comes up or something, and you say, do you have a permit? If the person volunteered that they had a gun, or the officer thinks they have a gun, they could say, hey, do you have a permit for that? But I think once you initiate, you can't initiate a Terry stop without knowing that they, without having some basis to believe they don't have a permit. Do you think the district court, I mean, the district court cited the Pope and the Mayo case and another district court case called Morton. Do you just read those different, or do you think she was legally wrong in that? I read Pope and Mayo differently. I think in those cases, Mayo and Pope, there was evidence of illegality. In Mayo specifically, the defendant, as soon as he saw the officers, fled and tried to evade them. And then when they came up to him, he was behaving nervously. I think when you have, when police officers have evidence that this person has, they think he has a concealed weapon, and they're doing something, you know, evasive or behaving nervously, you can then have reasonable suspicion that maybe they don't have a permit, that they're holding the gun unlawfully. But you need something more than just the knowledge of the gun. It's the gun plus something else. What if you also know that, you know, it's really, really hard to get these permits, and very few people have them? I know that's not the facts here, as I understand it. We don't know anything about how many of these permits there are from the record. But what if the record, what if the police officer testifies, look, I checked, and Virginia's only given out five of these permits? I mean, then at that point, can't you assume, aren't you close enough to reasonable suspicion if you see someone with a concealed weapon that odds are they are not one of the five people in the state of Virginia with a permit? Yes, I think that would be allowed, but the government would have to make that record with an officer below. So this was addressed in the Feliciana case, which is the one about the commercial vehicle. There, the government argued that, well, there's just not a lot of commercial vehicle permits. But they hadn't introduced that evidence below. And so at that point, if the officer doesn't have any reason, you know, if they don't have that evidence, they can't just stop people and check. But I'm just trying, so your position, it sounded like it was a blanket position, that in all circumstances, reasonable suspicion that someone has a concealed weapon would not equate with reasonable suspicion of illegality. But now I'm hearing you say it actually sort of depends on the facts on the ground and what sort of a showing is made about those facts. Yes, yes. We're not, there's no per se rule. It's just you need something more than the gun, whether that's evidence of the number of permits or some other indication of illegality like nervousness, evasive behavior, lying, something like that. So why don't you think, and this was the first question I asked you, that by the time he grabs his arm, you don't think there's reasonable suspicion that, and we're assuming now, assume with me for a minute, that there's reasonable suspicion of a concealed weapon. It would seem to me that once you're asked if you have a gun and you kind of repeat the question and act a little bit weird and don't offer up to the police officer, yeah, I have a gun, but I also have a permit, by then you don't think there's reasonable suspicion that this person does not have a permit. I think it's a close call. I don't know if I would agree with the description of Mr. Bland's behavior. I think he was just a little taken aback, took a moment, and then admitted he had a gun. He started reaching for his pocket, but there wasn't really, it happened so fast, there wasn't really time for him to say he had a permit. It could have just slipped his mind. I mean, if you're confronted by the police, you might be nervous. You might be reaching for the permit, even though that wasn't the case here. I just think at that point there might not have been enough, but it's a close call. I'll reserve the remaining of my time for a vote. Thank you. Thanks very much. You saved some time. Mr. Sawyers?  Good morning, Your Honors, and may it please the Court. Reid Sawyers for the United States. I want to start with what I think is a telling concession from my friend. Below and in the briefs there were sort of two points put forward as when the seizure occurred, either when Bland's arm was grabbed, which is our position, or when the officer walked up to the car. That was my friend's position below and in the briefs. Today he's changed positions to say it's when the officer asked about the gun. But by that point, even assuming you needed to negate the affirmative defense of the permit, which I'm happy to get to in a second, because Bland was leaning, because Bland was blading, and the officer believed that he was doing so to conceal a firearm, and doing so also implies you don't have permission to conceal a firearm, the officer would have had reasonable suspicion at that point. There wasn't, to be clear, a ton of discussion about this below because that point wasn't put forward as when a potential seizure would have occurred, but viewing the evidence in the light most favorable to the government, the officer would have had reasonable suspicion at that point. It's true that the district court at JA-210 said she wasn't relying on the blading, but she found the leaning actually occurred as a factual matter, and the fact that the district court could think of an innocent explanation for that conduct does not mean on appeal and viewing the evidence in the light most favorable to the government that that does not suffice for reasonable suspicion were we required to negate the affirmative defense. Turning to the seizure argument, it seems like the one factor my friend is putting forward as most dispositive is the question about whether he had a firearm. As you, Judge Harris, noted, that's not a particularly accusatory question to begin with, and we have cases like Inyala where officers literally told the defendant he matched the description of a murderer and asked whether he had a firearm. So if that wasn't sufficient to constitute a seizure in Inyala, telling someone you think they're a murderer, asking someone whether they still have a firearm is not sufficient here. Likewise, on the point about the officer being a foot or two away from the car, we have several driving cases where officers go up to a car, that's Lewis, that's Scott, that's General, and that's not sufficient. The mere fact that maybe it's temporarily harder for a second to get out of the car when an officer or even a random person is standing there because you're able to ask the officer to step away, that doesn't count as a seizure. And while not, cases about standing in front of a car specifically, I think Inyala and Weaver, which are cases about retention of a driver's license, which also in some sense temporarily prevent you from leaving, in those cases as well, the court said that doesn't suffice for a seizure because you're free to ask for them back. So I think the district court was absolutely correct in finding that Bland was not seized until the officer grabbed his arm. If the court has no questions about this seizure, I'm happy to turn to the issue about whether the officers needed to negate the permanent affirmative defense. I'm aware of a lot of our cases, and you've referred to some of them, and they're on the books, and we own the proper precedential respect, but do you really think someone in Mr. Bland's position felt free to ask the officer to move out of the way and say I just want to leave when he pulls up? I mean, is that reasonable for us to conclude that an individual confronted with a police officer coming to them would really feel like that was something that they could do? I mean, maybe they have the legal right if you're a lawyer and know all that, but would a normal person think, hey, I can tell the officer I want to talk, step away, if they don't I can climb over the console in the car and just walk away? Just to quickly answer that last part first, the primary means we think a reasonable person would have terminated the encounter is by asking the officers to step aside. So you don't need to think, I mean, we do think it's reasonable, we have this Adonis Perry case where someone actually did that, but the primary means we think a reasonable person would have terminated the encounter is by asking the officers to step aside, to answer the main thrust of your question. I think we have to remember that the standard here from Bostick and Drayton is whether a reasonable, innocent person would feel free to terminate the encounter, and it's very important this Court emphasized in McCoy that uncomfortable does not equal unconstitutional. In Weaver, this Court emphasized that awkwardness is not sufficient. In another case, the Supreme Court emphasized that even something that's somewhat intimidating is not sufficient. So I agree that often when you're around the police, it might be uncomfortable, it might even be a little bit intimidating, it might be a little bit awkward, but that does not rise to the level of a seizure. And I think, again, to return to cases like Anyala, there you have three officers, you're telling the person he's literally suspected of murder, and this Court has said that that doesn't suffice for a seizure. You have Scott, where the officer is knocked on the window of the defendant's car door, and as he awoke and as he tried to exit the car, the officer actually closed the door on the defendant and told him to roll down the window. And if those do not suffice to constitute seizures, I don't think this case is anywhere close to those. So when was the seizure here? The seizure was when, it's at 52 seconds into the video, it's when the officer, Goodnight, grabbed Bland's arm because he was reaching for the firearm. And I think just... You say reaching for the firearm, he was reaching for something. Well, yes, but I actually think this is a very important point to make. This Court has to view the evidence in the light most favorable to the government. Several times, both in the briefs and today, my friend made statements that... But you're saying we have to do that because there was a guilty verdict after a bench trial. That comes from the denial of the motion to suppress rather than from the guilty verdict, but yes. And so just a couple of examples of that, I don't want to go through all of them. But my friend said the officer shined the flashlight in Mr. Bland's eyes. That's not the finding made by the District Court. I don't think that's clearly supported by the video. I think the most important you are getting at, Judge Quattlebaum, is that there's no evidence in the record that Bland saw the cars come in or even saw the second officer, Officer Umstead, before the seizure occurred. The only testimony we have in the evidence is that right as Officer Goodnight was walking up to him, they made eye contact in the mirror, and that's at JA-160. There's the District Court in describing what happened, and I can't remember this from the video when I looked at it. It may have been there, and I just don't remember, but I appreciate your view. This is at like 209-210, and the court describes what happened as he says, this is Officer Goodnight, Sir, can you roll down your window? And that's in quotes. Is that what the video shows? My understanding is that the testimony was, and I believe this was from the video, but I don't have perfect recollection of this, is that Officer Goodnight simultaneously made some sort of gesture, like roll down your window, please, and I believe there was testimony that he simultaneously told Bland to roll down the window, and then there was some very quick sort of introductions, like, hey, man, how are you doing, from both of them, and then Officer Goodnight went into the question, like, hey, we had an undercover officer in here, and you're actually leaning on it. Do you still have your firearm on you? And I'm not preparing that those are exact quotes, to be clear, but something along those lines. Yeah, so the district court, or the transcript, has the district court describing things and has quotes around it, so I don't know if the court said quote, and what is quoted in the transcript is relatively similar to what you've just described. So, I mean, do you have a position of how that was happening? Was she quoting below what the video said, or was she essentially summarizing it in her words? So here's what I'll say. I didn't go through the district court's description and compare it word for word. I thought it was, as a general matter, an accurate characterization, but if you're, like, picking up on some, like, one or two-word difference, I can't countermand that because I didn't make that comparison. I was really trying to get to the notion that there was a point about whether the initial, maybe I misunderstood your colleague's position, but to the extent there's an insinuation that the very first words out of the officer's mouth are do you have a gun, it appears like that's not what the court found. Yeah, that's not what the court found. That's not what the video shows, and obviously my friend can talk for himself, but I don't think he's going to say that on reply. I think he'll acknowledge that there was some very quick small talk before the question about the gun. The entire from walking up to the car to the seizure was about 12, 14 seconds, depending on how you count, so it was certainly very fast. And as my friend conceded, if this court finds that the seizure occurred either when the arm was grabbed or, as we just argued, when the question was asked, we think there is reasonable suspicion without needing to get into the second question about whether the government needs to negate the affirmative defense. I'm happy to discuss that secondary question if the court would like to, or I'm also happy to rest on my grief since the court has no further questions. Oh, I would like to talk about it. It's just such an interesting question. It is. So your position is that everything turns on the way the statute is structured. It's because this is an affirmative defense. So I don't want to say like structured can mean two things. Structured can mean you're doing a statutory interpretation to determine whether something's an affirmative defense or an element, or it can mean in the Feliciana sense, there I think it's clear that the permit was an element, but we tried to argue in Feliciana that even though it appears the permit was an element there, something about the statutory structure being phrased as an exception, which isn't, you know, a term in elements versus affirmative defense, allowed the court to infer that the defendant did not have a permit. So we are focused on structure insofar as it means element versus affirmative defense. We are not making the argument rejected in Feliciana that even if something is an element, the way the statute is structured or written can allow you to infer that someone lacks a permit. But I thought Feliciana's point was slightly broader than that, that it was, look, these statutes are written in all different kinds of ways, and surely like that can't be what matters because what matters is sort of the facts on the ground. Like is this a rare thing or not? What is the common sense practical default assumption when you see a car on a road or when you see someone with a gun? But you read it more narrowly than that, you think Feliciana leaves room for the idea that, look, if it says right in the statute it's an affirmative defense, then that is per se not something the government has to deal with on reasonable suspicion. Yes, and I went back and read the briefs in Feliciana and listened to the oral argument, and I don't think the phrase affirmative defense ever came up. So I think it was taken for granted there that it was an element. So nothing in the opinion itself clearly addresses the affirmative defense elements distinction, and there would be no reason to because it never came up. And this is a well-established distinction in U.S. law, going back at least all the way to the Supreme Court case Collins from 1922, where the Supreme Court said that you don't need to address evidence of insanity. That was irrelevant to probable cause. But it just seems to me that with most affirmative defenses, I mean it also goes back for hundreds of years maybe, reasonable suspicion, probable cause, these are like factual common sense determinations. And the idea that, right, the government or the police don't need reasonable suspicion that you're not insane, if they see you casing a bank, I mean that corresponds to our reasonable common sense understanding that most people are not insane. Mostly if someone is casing a bank, they're not going to have an affirmative defense of insanity. But what if like everybody in Virginia is carrying one of these permits? Well, I will answer that, but to quickly say something, I do think this issue is ultimately resolved by finding precedent. So I do think it's a really interesting question in the abstract. But I do want to say I think the clearest case on this is Cloud from 2021, where the court is clear that even though the officers in North Carolina, which has the identical scheme, did not know whether the defendant had, was in conformance with North Carolina's concealed carry statute, they had a reasonable suspicion. But to return to the thrust of Your Honor's question. Hypothetically, what if, I don't even know how many adults there are in Virginia, but let's assume, or let's say in this county there's, I don't know, 200,000 adults and the police get on the stand and they say, yeah, I know that there are 200,000 concealed carry permits in this county, but so what? It's an affirmative defense. So I would say that as, like, if you look at all the courts of appeals, all the courts of appeals have basically adopted this elements affirmative defense distinction as a general matter, and at least five other courts of appeals, in addition to this court, we've seen adopting this as regards to. So you would say even if that police officer gets on the stand and says, I am aware that every adult in this county has a concealed carry permit, you would still have reasonable suspicion to stop someone if you knew they had a concealed permit? The exception to the rule is, courts have said, where it's, I don't remember the exact phrasing, but where the officers know that the affirmative defense is satisfied. Courts have said that if the officers actually know, or a reasonable officer, because this is the Fourth Amendment and it's objective standards, if a reason, oh, knew conclusively, that's the phrase I was looking for, if a reasonable officer would have known conclusively that an affirmative defense was satisfied, then they don't have reasonable suspicion or probable cause. So what if it was 200,000 adults and there's 195,000 concealed carry permits in that county? That's a very tough hypothetical, Your Honor, but we are going to stick to our position that this is the rule that courts have distinguished between elements in affirmative defenses. I think Judge Harris is advocating for mathematical analyses in the Fourth Amendment context. And I know courts are very leery of mathematical analyses. I'm actually, I find them somewhat convincing, so it's hard to push back on Judge Harris, but I will bite the bullet on that hypothetical. If it's somewhat probable that someone had an affirmative defense, our front-line position would be that they don't need to negate it. Now, is that good law enforcement practice? Absolutely not. Would we encourage law enforcement to do that? Absolutely not. But from a Fourth Amendment perspective, I think the rule is clear that unless a reasonable officer would know that the affirmative defense is conclusively established, they don't need to negate it. But, of course, this Court does not have to reach that issue here because of the seizure point. But that would be the only basis for a, if we felt the seizure occurred at the moment he approached the car, what you're just talking about with the concealed weapon being the reasonable suspicion, that's all there is, right, if not anything else? Yes, Your Honor. In other cases, there's testimony like people who carry their firearms in their pocket are not generally carrying lawfully in states where the concealed carry permit is an element. We concede that we do not have such testimony here. We do have the good faith argument. So even if this Court were to look past Cloud and Black and the Virginia Supreme Court's Whitaker case coming to the same place and say, you know, take those on bonk or something and say this was a Fourth Amendment violation, we do still think the officers, at the very least, relied in good faith on this Court's authority and the Virginia Supreme Court's authority permitting them to go up to someone they suspect of having a concealed weapon and engage in a tear stop. Does the sequence that Weaver observed, observing Mr. Bland first with maybe some of the gun visible and then him leaving and coming back and it being concealed, does that matter? Well, our primary position is that seeing the partially concealed weapon, seeing the two or three inches, was sufficient for Officer Weaver to have reasonable suspicion of a concealed weapon because the Virginia cases are clear. So you think that's concealed enough? But, as the District Court explained, it was even more obviously concealed when Bland came back into the store with it fully concealed. And there's testimony at JA-154 from Officer Goodnight that Detective Weaver told Officer Goodnight there was still some weight in the pocket. But is that still getting at whether it was concealed as opposed to getting at the fact that he was trying to hide it? So there's no testimony in the record that Bland recognized Officer Weaver as a detective. So obviously the court has to view inferences in the light most favorable to the government. But I don't think we ever advanced an argument that that was, you can infer from Bland going out to the car and then coming back with it fully zipped up, that that was him trying to hide it, which in turn showed he didn't have a concealed carry permit. It's also a little inconsistent with the concession that there was no suspicious activity besides a concealed weapon. The officers didn't rely on his return as indicative of suspicion, Bland lacked a permit, because they've obviously been trained on Virginia law, which is that you don't need suspicion to conduct a Terry stop on this basis. If the court has no further questions, we urge the court to affirm. Thank you. Thank you very much, sir. Mr. Mancini. Thank you. I'd like to make a few quick points on the seizure issue and reasonable suspicion. On the seizure, first I'd like to start with the cases my friend on the other side cited, Inala and Scott. Inala is a pedestrian case where they walked up to someone who was free to move about, walk back and forth. This case is much different. Mr. Bland was trapped in the car with no way to move. I mean, if he tried to open the door, he could have hit officer, he would have hit officer goodnight and could have been charged with assault of an officer. And I think this case is similar to Cloud, which has both a seizure and a reasonable suspicion component. On the seizure component in Cloud, two officers were pointing out. And the point is you're trying to make the seizure earlier? Yes, yes. The seizure occurred earlier, and I think it. When did it occur in your view? I think it occurred when the officer asked if he had a gun in his pocket at that point. And at Cloud, it was similar facts where the officers were pointing their flashlights at a vehicle with occupants. They thought there might have been a concealed weapon inside. I know you mentioned you weren't handling this below. I hope this doesn't sound like I'm saying someone did something wrong. But is there an issue? Did you advance or did Mr. Bland advance that argument that the seizure occurred at the time of the question below? Yeah. I mean, I don't know the precise wording, but it was when the officer approached and started talking to him, before the grab. It was clear.  Those are, well, those are different things, aren't they? One position could be just merely walking up there is a seizure, just the presence of the officer coming up and approaching him. Another position could be that's not, but when you ask a question about a gun, there's a seizure. I know this is relatively short in time, but those are different positions. And what I'm just trying to figure out, without deciding what difference it might ultimately make, is now if you're saying it was when the question was asked, is that different from what was argued below? I don't think so. Again, I'd have to go back and look exactly at the wording of the motion to suppress. I think there is a distinction can be made between when Mr. Bland rolled down the window and then seconds later when the officer asked, do you still have the firearm? To be honest, I think the question just adds to it. There actually might be a seizure when he rolls down the window and submits to the show of authority, but then asking the question about the gun on top of that, I think, just confirms the show of authority here. You're saying Judge Haynes got it wrong. Is that what you're saying? The judge below? Yes. Yes, Judge Haynes. Yes, Judge Haynes. Well, she found that the seizure... What's the error she made that you're focused on? That she concluded that the seizure occurred not until the officer reached in and grabbed his firearm. How many seconds is there between what you said the seizure occurred and when she said the seizure occurred? I haven't timed it exactly, but I would say somewhere between three to five seconds. Three and five seconds. Yes. But I think in that time there is a significant difference. Obviously, Mr. Bland started reaching for the firearm before then. The only thing the officers knew was that he had a firearm, nothing else. They didn't have any suspicious movements or anything like that. But I think going back to my point about Cloud, in that case the officers were standing back from a car, pointing their flashlights and asking if they had guns or drugs inside the car, and this court concluded that that was a seizure. So this case isn't different. Moving to reasonable suspicion, I don't agree that the Cloud reasonable suspicion analysis decides this issue. In Cloud there were some different facts. Most notably, the officers had testified that the parking lot they were in was a high crime area. We don't have that fact here. And, in fact, the officers in Cloud had found guns. There were other facts in Cloud, I agree, and the court could have reasoned the issue that way in Cloud, said under these circumstances the concealed weapon, reasonable suspicion of a concealed weapon, equated to reasonable suspicion of illegality. But that's not what we said. We just said reasonable suspicion of a concealed weapon is potential illegality, and that is good enough for reasonable suspicion. I think in that case they said that they didn't know exactly whether he had a permit or not, but I think given the other factors the officers had reasonable suspicion. That's not what we said. We said potential. We used the word potential. The fact that you have a concealed weapon means you are potentially illegally carrying a weapon, and that's good enough for reasonable suspicion. We dispensed with the whole thing in like two sentences. I mean, I don't know how much this issue, I did not go back and look at the briefs, and I don't know how much this issue was briefed and argued and focused on in Cloud, but just the language of the opinion, I think, is pretty conclusive in the way it talks about this. Well, I would say, I guess I read the opinion slightly differently because there was a longer explanation. The court actually went through some of the facts, including the high crime area, there were minors in the car, which I think matters, and then said, then used the word potential, and I think when you have a high crime area, when you have maybe a violation of a different firearms statute. So you feel like they were sort of incorporating that discussion. Exactly, and I think at that point they might have reasonable suspicion that there was a potential concealed weapons violation, but the fact that the gun itself is not enough on its own, and that's all we have here. And just one last quick point on the affirmative defense point. Some driver's license statutes also make having a license or a permit an affirmative defense. So if we follow the government's position in this case, then that would overturn Delaware v. Pruce, the Supreme Court's precedent. Which I remember coming up in oral argument in Feliciano. Yeah, exactly. Just because the permit is an affirmative defense does not relieve the officers of their obligation to have reasonable suspicion that the person does not have a permit or is doing something illegal. If there are no further questions, I'll rest my case. Thank you. Thank you very much. We appreciate you. And we'll come down and re-counsel and then call the next case. Thank you. Appreciate your work. I appreciate everybody making it a little bit easier. Appreciate you doing something. Thank you. Thank you. Thank you. Thank you.
judges: Robert B. King, Pamela A. Harris, A. Marvin Quattlebaum Jr.